1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

SILVER FERN CHEMICAL, INC., a
Washington corporation,

            Plaintiffs,

      v.

SCOTT LYONS, an individual; TROY
KINTO, an individual; KING HOLMES, an
individual; ROWLAND MORGAN, an
individual; and AMBYTH CHEMICAL
COMPANY, a Washington corporation,

            Defendants.

18

19

20

SCOTT LYONS, an individual, and KING
HOLMES, an individual,

            Counterclaim Plaintiffs,

      v.

21

22

23

SILVER FERN CHEMICAL, INC., a
Washington corporation; SAM KING, an
individual; and LISA KING, an individual,

            Counterclaim Defendants.

24

CASE NO. 2:23-cv-00775-TL

ORDER ON MOTION FOR
SUMMARY JUDGMENT AND
MOTION TO SEAL

This is an action for damages and injunctive relief for the misappropriation of trade secrets, breach of contract, and other related claims. This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 118) and Plaintiff's Motion to Seal (Dkt. No. 128). Having reviewed the Parties' briefing and the relevant record, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment and GRANTS the Motion to Seal.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    The Sales Defendants' Employment at Plaintiff

Sam and Lisa King founded Plaintiff Silver Fern Chemical, Inc., in 2004. Dkt. No. 9 (sealed) (King declaration) ¶ 5. Defendants Scott Lyons, Troy Kinto, and King Holmes (collectively, the "Sales Defendants") are former employees and salespeople of Plaintiff. *Id.* ¶ 3. Defendants Lyons and Holmes joined Plaintiff in 2008 and had no experience in the chemical distribution industry prior to working for Plaintiff. *See* Dkt. No. 132-1 (sealed) (Holmes deposition) at 4 (11:20–24); Dkt. No. 132-2 (sealed) (Lyons deposition) at 4 (15:19–23); Dkt. No. 9 ¶ 30. Defendant Kinto joined Plaintiff in 2014 with some prior experience and brought a handful of customers to Plaintiff. Dkt. No. 9 ¶ 30.

When the Sales Defendants joined Plaintiff, they each signed Confidentiality Agreements and acknowledgments of Plaintiff's confidentiality policies. *See* Dkt. Nos. 1-2 (Lyons), 1-4 (Holmes), 1-6 (Kinto). Defendants Holmes and Lyons agreed to keep confidential information including "the identity of our customers [and] the identity of our suppliers" as well as "details of our transactions with customers and suppliers." Dkt. No. 1-2 at 2; Dkt. No. 1-4 at 2. Defendant Kinto agreed to keep confidential information including "the names, addresses, telephone numbers, practices, preferences, or buying habits or plans of the Company's customers or suppliers." Dkt. No. 1-6 at 2.

1

2

### 2.      The Sales Defendants' Departure from Plaintiff

Sometime in late 2022 to early 2023, the Sales Defendants began discussing with

Defendant Rowland Morgan the possibility of leaving Plaintiff to work at Defendant Ambyth

Chemical Company. *See* Dkt. No. 130-3 (Morgan deposition) at 5 (54:4–56:18). Around the

same time, Defendant Morgan had begun exploring the possibility of selling Defendant Ambyth,

which he owned. *See id.* (56:11–13). He was looking for sales representatives with a "book of

business," as he was "not going to train someone in doing what I'm doing." *Id.* at 4 (47:21–

48:10). Defendant Morgan talked to "all of [the Sales Defendants] together at the same time,"

and the idea of leaving Plaintiff "was essentially . . . the brain idea of this coalition." *Id.* (54:4–

17). The Sales Defendants also discussed their plans to leave Plaintiff with each other. *See* Dkt.

Nos. 130-4, 130-5 (text messages). And in January and February 2023, Defendant Holmes

created spreadsheets with information about the customers he had serviced at Plaintiff, including

the types of products they bought and their points of contact. *See* Dkt. No. 132-1 at 8 (45:12–

47:14), 8–9 (48:24–52:20).

On March 24, 2023, Defendant Morgan offered jobs to the Sales Defendants—the same

day they all had dinner at a conference in Texas. *See* Dkt. No. 132-1 at 7 (33:19–35:1). At least

Defendant Holmes "had a pretty good feeling" in advance that the conference dinner would

include discussion of potential employment at Defendant Ambyth. *See id.* (34:20–35:1). When

Defendant Morgan offered the jobs, his "expectation" was that the Sales Defendants "would

bring a portion of their book of business with them to [Defendant] Ambyth." Dkt. No. 130-3 at 6

(66:20–67:14).

Following the job offers, the Sales Defendants continued to discuss their departure with

each other. *See* Dkt. Nos. 130-6, 130-7, 130-8 (text messages); *see also* Dkt. No. 132-2 (sealed)

(Lyons deposition) at 6 (87:9–88:12). On April 6, 2023, Defendant Holmes modified a spreadsheet (distinct from the ones created in 2023) that contained information related to one of his customers. *See* Dkt. No. 132-1 at 11–12 (58:15–61:18).

Between April 14 and 15, 2023, the Sales Defendants accepted job offers with Defendant Ambyth. *See* Dkt. No. 30 at 12–20 (offer letters). On April 17, 2023, the Sales Defendants sent emails to Plaintiff's leadership and their colleagues, announcing their resignations effective as of April 14. Dkt. No. 9 ¶ 65.

Between January 17 and April 17, 2023, the Sales Defendants attempted to permanently delete thousands of items from their Microsoft Outlook mailboxes. *See* Dkt. No. 11 (sealed) (Polus declaration) ¶¶ 14, 25, 31; *see also* Dkt. No. 130-9 (Polus deposition) at 4 ("[F]or all three users to have the same deletions, access, separate date would suggest a collaboration, you know, in my experience doing these kinds of analyses."). Counsel for Plaintiff asserts that Plaintiff incurred costs from Consilio, a forensic specialist, for "investigation and remediation" related to these deletions. Dkt. No. 132 (sealed) (Boyd declaration) ¶¶ 12–13, 23; Dkt. Nos. 130-11, 130-12 (invoices).

### 3. The Sales Defendants' Activities at Defendant Ambyth

After their departure from Plaintiff and in their new employment with Defendant Ambyth, the Sales Defendants had communication with various customers they had serviced at Plaintiff. Defendant Holmes solicited business from at least two prior customers, whose specific chemical needs he learned from his time working at Plaintiff. *See* Dkt. No. 132-1 at 13–14 (71:3–72:10, 73:12–19), 19 (142:4–23). Similarly, Defendant Lyons contacted multiple prior customers with references to products sold to them while he was at Plaintiff. *See* Dkt. No. 132-2 at 8 (117:1–119:10), 10 (148:2–14), 11–12 (156:15–158:2), 13 (161:4–163:8); *see also* Dkt. No. 132-5 (sealed) at 2 (email from Defendant Lyons to customer dated April 19, 2023); Dkt.

No. 132-6 (sealed) at 3 (email from Defendant Lyons to customer dated April 18, 2023).
Defendant Lyons also initiated contact with other prior customers, though what specific
information was discussed is not in the record. *See, e.g.*, Dkt. No. 132-2 at 14–15 (172:19–
173:1), 15 (175:11–22).

### 4. The Beaton Report

In response to an interrogatory regarding its claims for damages, Plaintiff identified an
expert report by Neil J. Beaton. *See* Dkt. No. 119-1 (supplemental response and objections) at 4;
Dkt. No. 119-2 (the "Beaton Report"). Mr. Beaton "calculated lost profits damages to [Plaintiff]
under the assumption that Defendants wrongfully used [Plaintiff's] trade secrets and confidential
information to cause [Plaintiff's] customers to leave [Plaintiff] and transact with [Defendant]
Ambyth." Dkt. No. 119-2 ¶ 5; *see also* Dkt. No. 119-3 (Beaton deposition) at 5 (11:21–22) ("I'm
making the assumption that – that business was diverted by the defendants.").

In his deposition, Mr. Beaton declined to make a conclusion about causation. Dkt.
No. 119-3 at 8 (14:24) ("I won't be opining on causation, no."). Mr. Beaton also clarified that he
did not investigate other reasons for lost customers, or whether Defendants had prior
relationships with the lost customers.[1] *See id.* at 6 (12:16–18), 7 (13:16–25), 11 (17:5–19). He
did not account for whether Defendant Ambyth gained any business from the lost customers, and
he did not allocate responsibility for damages among the individual Defendants. *See id.* at 8–11
(14:2–15:8, 15:19–17:4).

---

[1] Sam King, Plaintiff's designee under Federal Rule of Civil Procedure 30(b)(6), testified that he did not have any
personal knowledge of the reasons why lost customers moved their business from Plaintiff to Defendant Ambyth.
*See* Dkt. No. 119-4 at 8–9 (36:23–37:2).

1   **B.       Procedural History**

2          On May 24, 2023, Plaintiff commenced this action and simultaneously moved for a

3   temporary restraining order ("TRO"). Dkt. Nos. 1, 3. On June 2, the motion for TRO was denied,

4   though a request to reconsider that decision remains pending. Dkt. No. 40; *see also* Dkt. No. 151

5   at 6–7 (reserving decision). On December 19, Defendant's motion to dismiss the Complaint was

6   granted in part and denied in part, and on February 15, 2024, a Second Amended Complaint was

7   ultimately filed. Dkt. Nos. 70, 84 (sealed). Defendants now move for summary judgment on all

8   claims. Dkt. No. 118; *see also* Dkt. No. 140 (reply). Plaintiff opposes. Dkt. No. 131 (sealed).

9              **II.      MOTION FOR SUMMARY JUDGMENT**

10  **A.       Legal Standard**

11         Summary judgment is appropriate where "the movant shows that there is no genuine

12  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

13  Civ. P. 56(a). A genuine issue of material fact exists where "the evidence is such that a

14  reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

15  477 U.S. 242, 248 (1986). The inquiry turns on "whether the evidence presents a sufficient

16  disagreement to require submission to a jury or whether it is so one-sided that one party must

17  prevail as a matter of law." *Id.* at 251–52.

18         The court must draw all justifiable inferences in favor of the non-movant. *Id.* at 255. The

19  court does not make credibility determinations or weigh evidence at this stage. *Munden v.*

20  *Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021); *see also Lujan v. Nat'l Wildlife*

21  *Fed'n*, 497 U.S. 871, 888 (1990) ("[W]here the facts specifically averred by [the non-moving]

22  party contradict facts specifically averred by the movant, the [summary judgment] motion must

23  be denied.").

24

If the non-movant bears the burden of proof at trial, the movant only needs to show an absence of evidence to support the non-movant's case. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once such a showing is made, the burden shifts to the non-movant to show more than the mere existence of a scintilla of evidence in support of its case—the party must show sufficient evidence that a jury could reasonably find for the non-movant. *Id.* (citing *Anderson*, 477 U.S. at 252). Even if the non-movant does not have the burden of proof at trial, it must nonetheless show that a genuine issue of material fact exists by presenting evidence in its favor. *F.T.C. v. Stefanchik*, 559 F.3d 924, 929–30 (9th Cir. 2009) (affirming summary judgment for plaintiff where defendants failed to show significantly probative evidence to dispute plaintiff's evidence).

In short, the Federal Rules of Civil Procedure "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322 (citing Fed. R. Civ. P. 56(c)).

**B.    Discussion**

Defendants move for summary judgment on all claims. Dkt. No. 118 at 11–24. Defendants primarily argue that Plaintiff has not shown that any of the alleged conduct *caused* damage to Plaintiff. *Id.* at 12–24. Defendants also argue that the individual Defendants should be dismissed because Plaintiff does not show damages attributable to any individual Defendant. *Id.* at 12. Plaintiff opposes. Dkt. No. 131 at 20–32.

1

### 1.   Causation of Damages

2

#### a.   *Computer Fraud and Abuse Act ("CFAA")*

3

Plaintiff brings a CFAA claim against Defendants Lyons, Kinto, and Holmes. Dkt.

4 No. 84 ¶¶ 131–136. The Sales Defendants argue that Plaintiff has not produced evidence of

5 damages from alleged violations of the CFAA, as any deleted emails were recovered and there is

6 no evidence that the deletion of emails resulted in a reduction in business. *See* Dkt. No. 118 at

7 13. Plaintiff responds that it suffered damages in the form of "restoration and investigation

8 costs." Dkt. No. 131 at 30; *see id.* at 29–30.

9

"Whoever knowingly causes the transmission of a program, information, code, or

10 command, and as a result of such conduct, intentionally causes damage without authorization, to

11 a protected computer" is liable under the CFAA. 18 U.S.C. § 1030(a)(5)(A). "Any person who

12 suffers damage or loss by a reason of a violation of [18 U.S.C. § 1030]" may bring a civil action

13 for "compensatory damages" and injunctive or other equitable relief. 18 U.S.C. § 1030(g).

14

"[T]he term 'damage' means any impairment to the integrity or availability of data, a

15 program, a system, or information." 18 U.S.C. § 1030(e)(8). The material at issue need not be

16 permanently lost. *See United States v. Keys*, 703 F. App'x 472, 475 (9th Cir. 2017) (affirming

17 denial of jury instruction that "information altered by a defendant was not damaged under the

18 CFAA, if the original version was not permanently lost"). Finally, "the term 'loss' means any

19 reasonable cost to any victim, including the cost of responding to an offense, conducting a

20 damage assessment, and restoring the data, program, system, or information to its condition prior

21 to the offense, and any revenue lost, cost incurred, or other consequential damages incurred

22 because of interruption of service." 18 U.S.C. § 1030(e)(11). "Thus, while 'damage' covers harm

23 to data and information, 'loss' refers to monetary harms sustained by the plaintiff." *NovelPoster*

24

1  *v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 961 (N.D. Cal. 2014) (citing *Phillips v. Ex'r of*

2  *Est. of Arnold*, No. C13-444, 2013 WL 4458790, at *4 (W.D. Wash. Aug. 16, 2013)).

3      Here, the Court finds that Plaintiff has produced evidence that the Sales Defendants

4  "cause[d] damage" to its data by deleting emails without authorization. 18 U.S.C.

5  § 1030(a)(5)(A). Defendant Holmes deleted 10,908 items from his work email account with

6  Plaintiff, while Defendant Kinto deleted 2,544 items and Defendant Lyons deleted 2,281 items.

7  *See* Dkt. No. 11 ¶¶ 14, 25, 31. The Sales Defendants do not dispute that the emails were

8  temporarily (if not permanently) deleted. *See* Dkt. No. 119 at 13.

9      In addition, the Court finds that Plaintiff has produced evidence that it suffered a "loss" in

10  "conducting a damage assessment." 18 U.S.C. § 1030(e)(11). Plaintiff provides "the invoices it

11  paid for investigation," and the Sales Defendants do not dispute that Plaintiff provided those

12  invoices during discovery. Dkt. Nos. 130-11, 130-12 (listing services for "internal

13  investigation"); *see also* Dkt. No. 132 ¶ 23. Moreover, contrary to the Sales Defendants'

14  assertion (*see* Dkt. No. 140 at 10–11), the emails were not discovered as part of "routine

15  services." Plaintiff retained Consolio to provide services that it routinely offers to investigate

16  departed employees, but Plaintiff was not conducting a routine investigation. Rather, Plaintiff

17  hired Consolio specifically to investigate the departure of the three Sales Defendants. *See* Dkt.

18  No. 141-4 (Polus deposition) at 5 (14:2–14) ("We were told that some individuals had left

19  [Plaintiff] and that they wanted our . . . departed employee protocol or product . . . .").

20      However, the Court finds that Plaintiff has not produced any evidence that it suffered a

21  "loss" for "restoring the data" deleted by the Sales Defendants. The same Consolio invoices do

22  not identify any restoration services. *See* Dkt. Nos. 130-11, 130-12. In a declaration, counsel for

23  Plaintiff asserts that the basis for the "investigation *and remediation*" loss are the invoices. Dkt.

24

No. 132 ¶ 23 (emphasis added). But the invoices list the engagement solely as "Internal Investigation" with no mention of remediation. Dkt. Nos. 130-11, 130-12.

Finally, the Sales Defendants argue that Plaintiff fails to show that the deletion of emails lead to a reduction in business. Dkt. No. 118 at 13 (citing *Czech v. Wall St. on Demand, Inc.*, 674 F. Supp. 2d 1102, 1113 (D. Minn. 2009)). This argument is easily dispatched, as the plain text of the CFAA authorizes "compensatory damages" for "any reasonable cost to any victim, including the cost of . . . conducting a damage assessment." 18 U.S.C. §§ 1030(e)(11), (g). Revenue lost (assuming this is what Defendants consider a reduction in business) is just one example in a list of types of loss (connected by the disjunctive term "or") that are contemplated by the statute and is, therefore, clearly not required to show loss. 18 U.S.C. § 1030(e)(11). Moreover, in *Czech*, the plaintiff—who sued the defendant after receiving unwanted text messages—alleged "loss" based on information alleged obtained from her cell phone (*i.e.*, "that the wireless number is active, the general geographic area where the user is located (via the [recipient's area code]), and that future text messages can be sent to that active wireless number"). 674 F. Supp. 2d at 1104, 1114. The court held that plaintiff could not plausibly allege a cost from the discovery of such information, assuming information was obtained at all. *See id.* at 1114. Here, in contrast, Plaintiff has alleged costs in the form of an investigation.

Therefore, as to Plaintiff's CFAA claim, Defendants' motion is GRANTED IN PART as to restoration costs and DENIED IN PART as to investigation costs.

### b.   *Defend Trade Secrets Act ("DTSA") and Washington Uniform Trade Secrets Act ("WUTSA")*

Plaintiff brings DTSA and WUTSA claims against all Defendants. Dkt. No. 84 ¶¶ 150–63 (DTSA), 164–77 (WUTSA). Defendants argue that Plaintiff has not produced "any evidence showing that misappropriation of [alleged trade secrets] caused the business losses identified in

Beaton's report." Dkt. No. 118 at 15; *see id.* at 14–17 (DTSA), 17–18 (WUTSA). In response, Plaintiff argues that Defendants disclosed Plaintiff's confidential customer list and used it to solicit customers. *See* Dkt. No. 131 at 24–28. Notably, for purposes of this motion, Defendants "do not dispute" that the categories of information identified by the Court in its Order on Defendants' Motion to Dismiss "could be DTSA-protected trade secrets."[2] Dkt. No. 118 at 15; *see* Dkt. No. 70 (order) at 11–12. Given that Defendants do not move for summary judgment on the grounds that Plaintiff's alleged trade secrets are not actually trade secrets (despite significant argument from both Parties on this point), the sole issue before the Court is whether there is evidence that the alleged trade secrets have been misappropriated.

Under both the DTSA and WUTSA, trade secret "misappropriation" is defined as the "acquisition" of a trade secret, 18 U.S.C. § 1839(5)(A), RCW 19.108.010(2)(a), or the "disclosure or use" of a trade secret, 18 U.S.C. § 1839(5)(B), RCW 19.108.010(2)(b). A plaintiff is entitled to certain damages "caused by" such misappropriation. 18 U.S.C. § 1836(b)(3)(B); RCW 19.108.030(1). Under WUTSA, damages can be for either "actual loss" or "unjust enrichment." RCW 19.108.030(1). Misappropriation may be proven by "circumstantial as well as direct evidence." *Brocade v. Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1215–1216 (N.D. Cal. 2012) (citing *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007)); *see also Modumetal, Inc. v. Xtalic Corp.*, 4 Wn. App. 2d 810, 824, 425 P.3d 871 (2018) ("Misappropriation of trade secrets can be notoriously difficult to prove: . . . 'In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him

---

[2] Still, Defendants argue that to the extent Plaintiff asserts that mere "relationships with customers and vendors" are trade secrets, the claim should fail. *See* Dkt. No. 118 at 15–17. In response, Plaintiff asserts that its alleged trade secret is "its confidential customer list." Dkt. No. 131 at 22; *see id.* at 21–24.

1    that it is more probable than not that what plaintiffs allege happened did in fact take place.'"

2    (quoting *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1231 (W.D.N.Y. 1994))). "A former

3    employee misappropriates an employer's trade secrets by soliciting customers from a

4    confidential customer list that has independent value, because its contents are unknown and

5    subject to reasonable efforts to keep secret." *Guidance Res., LLC v. Mangrio*, 1 Wn. App. 2d

6    1048, 2017 WL 6452421, at *7 (2017).

7         Here, the Court finds that Plaintiff has produced sufficient evidence to create a genuine

8    dispute of material fact as to whether Defendants misappropriated trade secrets.

9         Defendant Holmes testified that he expected to bring some of his prior customers to

10   Defendant Ambyth, and Defendant Morgan testified to the same expectation. *See* Dkt. No. 132-1

11   at 5–6 (28:16–29:12); 130-3 at 6 (66:20–67:14). While still working at Plaintiff, the Sales

12   Defendants communicated with each other about their pending departure. *See, e.g.*, Dkt.

13   No. 130-8 at 2 (Defendant Holmes: "When we give notice we need to be hitting the phones big

14   time. . . . FYI, there is a chance our phones could be subpoena'd if this gets ugly."); Dkt.

15   No. 130-6 at 2 (Defendant Holmes: "Having a huge day and it's just pissing me off. Do you

16   think I can tell folks to push back their orders? Damnit!"); Dkt. No. 130-7 at 2 (Defendant Kinto:

17   "[O]ne thing we all need to be careful of is that we've been sharing all this info with each other.

18   That violates the agreements we signed."). Defendant Holmes also created spreadsheets

19   containing information about customers and their specific needs—spreadsheets that were

20   modified or accessed after accepting a job at Defendant Ambyth or even after leaving Plaintiff.

21   *See* Dkt. No. 132-1 at 8 (45:12–47:14), 8–9 (48:24–52:20), 11–12 (58:15–61:18), 15 (93:7–18).

22        Defendants Holmes and Lyons also testified to conducting business with various prior

23   customers after leaving Plaintiff and joining Defendant Ambyth. *See, e.g.*, Dkt. No. 132-1 at 15

24   (94:13–95:15), 16 (99:16–22), 20 (148:9–16); Dkt. No. 132-2 at 7–8 (116:24–119:10); *see also*

Dkt. No. 132-4 at 3 (email from Defendant Lyons to customer dated April 17, 2023). Defendant

Holmes testified that he solicited business from at least two of those customers while also

acknowledging that he knew their specific chemical needs from his time working at Plaintiff. *See*

Dkt. No. 132-1 at 13–14 (71:3–72:10, 73:12–19), 19 (142:4–23). Similarly, Defendant Lyons

contacted multiple prior customers with references to products sold to them while he was at

Plaintiff. *See* Dkt. No. 132-2 at 8 (117:1–119:10), 10 (148:2–14), 11–12 (156:15–158:2), 13

(161:4–163:8); *see also* Dkt. No. 132-5 (sealed) at 2 (email from Defendant Lyons to customer

dated April 19, 2023); Dkt. No. 132-6 (sealed) at 3 (email from Defendant Lyons to customer

dated April 18, 2023).

Finally, experts for both Plaintiff and Defendants have calculated some amount of

damage in lost profits.[3] *See* Dkt. No. 119-2 at 10; Dkt. No. 130-18 at 4 (159:11–15). And

Plaintiff has identified numerous customers doing business with Defendant Ambyth that had not

done so prior to the departure of the Sales Defendants, *see* Dkt. No. 132-10 (sealed) (list of

customers), with Defendants' own expert identifying 76 of Plaintiff's customers doing business

with Defendant Ambyth that had never done business with it prior to the Sales Defendants

joining it. *See* Dkt. No. 132-10 (sealed) (Schedule 6 to Barrick Report). From those 76 new

customers, Defendant Ambyth realized approximately $7.8 million in total sales. *See* Dkt.

Nos. 132-8 (sealed) (Defendant Ambyth's sales by customer, January–April 2024), 132-9

(sealed) (Defendant Ambyth's sales by customer, January–December 2023), 132-10.

To be sure, it would not be enough for Plaintiff to point to the Sales Defendants' mere

defection to Defendant Ambyth, or even the Sales Defendants' announcement of their new

employer to their prior customers. *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521

---

[3] Thus, the Court need not reach the Parties' arguments regarding unjust enrichment as an alternative basis for damages.

(9th Cir. 1993) ("Merely informing a former employer's customers of a change of employment, without more, is not solicitation."); *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 437, 971 P.2d 936 (1999) ("As a general rule, an employee who has not signed an agreement not to compete is free, upon leaving employment, to engage in competitive employment."). Some of the evidence produced by Plaintiff could be interpreted by a reasonable jury as customers simply choosing to continue their relationship with the Sales Defendants upon learning of their new employment.

But as detailed above, Plaintiff has gone beyond that, and the Sales Defendants still owed Plaintiff a duty not to misappropriate trade secrets. *See MAI Sys.*, 991 F.2d at 521 ("[M]isappropriation occurs if information from a customer database is used to *solicit* customers." (emphasis in original)); *Nowogroski*, 137 Wn.2d at 437 ("[T]he former employee, even in the absence of an enforceable covenant not to compete, remains under a duty not to use or disclose, to the detriment of the former employer, trade secrets acquired in the course of previous employment."). Here, a reasonable jury could also conclude that the Sales Defendants used Plaintiff's confidential customer list to solicit business from their prior customers for at least the 76 customers with whom Defendant Ambyth had no relation prior to hiring the Sales Defendants. Defendants may be able to challenge some, much, or all of that evidence at trial in various ways. But on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the non-movant and cannot find that the evidence presented is so one-sided that Defendants must prevail as a matter of law.

Therefore, as to Plaintiff's DTSA and WUTSA claims, Defendants' motion is DENIED.

### c. *Breach of Contract*

Plaintiff brings a breach of contract claim against Defendants Lyons, Kinto, and Holmes. Dkt. No. 84 ¶¶ 137–42. The Sales Defendants acknowledge that Plaintiff's breach of contract

claim is based on the confidentiality agreements executed by Defendants Holmes, Lyons, and Kinto. *See* Dkt. No. 118 at 19. The Sales Defendants argue that Plaintiff "has not produced any evidence to show that the alleged reduced profits resulted from the improper use or disclosure of any confidential information." *Id.*; *see also id.* at 19–22. In response, Plaintiff argues that Defendant Kinto admitted that the Sales Defendants breached their confidentiality agreements and that a jury could find that those breaches led to lost profits and unjust enrichment. *See* Dkt. No. 131 at 30–31.

A claim for breach of contract requires proof of three elements: (1) existence of a contract; (2) breach of that contract; and (3) damages. *See Univ. of Wash. v. Gov't Emps. Ins. Co.*, 200 Wn. App. 455, 467, 404 P.3d 559 (2017).

Here, for similar reasons discussed above, *see supra* Section III.B.1.b, the Court finds that Plaintiff has produced sufficient evidence to create a genuine dispute of material fact that its reduced profits resulted from the Sales Defendants' breach of their confidentiality agreements. There is evidence in the record that the Sales Defendants used, at least in some cases, information about prior customers and their specific needs to solicit new business at Defendant Ambyth, which may be in violation of their confidentiality agreements. *See* Dkt. Nos. 1-2, 1-4, 1-6.

Therefore, as to Plaintiff's breach of contract claim, Defendants' motion is DENIED.

### d.    *Duty of Loyalty and Confidentiality*

Plaintiff brings a claim for "breach of duties of loyalty and confidentiality" against Defendants Lyons, Kinto, and Holmes. Dkt. No. 84 ¶¶ 143–49. The Sales Defendants argue that even if there were evidence of use of confidential information in violation of the duty of confidentiality, Plaintiff provides no evidence that any alleged use or disclosure caused reduction in profits identified by Beaton. *See* Dkt. No. 118 at 22. Similarly, the Sales Defendants argue that even if they solicited customers during their employment with Plaintiff (as required for a breach

of the duty of loyalty), Plaintiff provides no evidence of causation. *See id.* at 22–23. In response,

Plaintiff echoes its arguments in support of its claim for breach of contract. *See* Dkt. No. 131 at

31. Plaintiff also points to deposition testimony and text messages by Defendant Holmes. *Id.*; *see*

Dkt. No. 132-1 at 17–18 (103:5–107:8), 20 (148:9–14); Dkt. No. 130-6.

　　　"Common law agency doctrine is relevant to all employment relationships as it defines,

among other things, the duties that the employer and employee owe to each other. In such a

relationship, the employee or 'agent' owes fiduciary duties to the employer or 'principal.'"

*Steven Cole Salon, LLC v. Salon Lotus*, 148 Wn. App. 1036, 2009 WL 309196, at *5 (2009).

"One of these fiduciary duties is the 'duty to act loyally for the principal's benefit in all matters

connected with the agency relationship.'" *Id.* (quoting Restatement (Third) of Agency § 8.01).

"This duty prevents a current employee from competing with the employer or assisting others to

compete with the employer." *Id.* (citing Restatement (Third) of Agency § 8.04); *see also*

*Kieburtz & Assocs., Inc. v. Rehn*, 68 Wn. App. 260, 265, 842 P.2d 985 (1992) ("During the

period of his or her employment, an employee is not 'entitled to solicit customers for [a] rival

business . . .' or to act in direct competition with his or her employer's business." (quoting

Restatement (Second) of Agency § 393 cmt. e (1958))). This duty "also prevents an employee

from the using the employer's property, including confidential information, for the employee's

or another's purposes." *Steven Cole Salon, 2*009 WL 309196, at *5 (citing Restatement (Third)

of Agency § 8.05); *accord USI Ins. Servs. Nat'l, Inc. v. Ogden*, 371 F. Supp. 3d 886, 898–99

(W.D. Wash. 2019).

　　　Here, the Court finds that Plaintiff has produced sufficient evidence to create a genuine

dispute of material fact that Defendants Holmes and Lyons either solicited customers or acted in

direct competition with Plaintiff's business, or used confidential information for their own

purposes, while Plaintiff still employed them. Plaintiff cites deposition testimony from

Defendant Holmes that he was in contact with a customer on April 13, 2023, while still working for Plaintiff (*see* Dkt. No. 132-1 at 17–18 (103:5–107:8)) and that he once said to Defendants Lyons and Kinto, "Do you think I can tell folks to push back their orders?" (Dkt. No. 130-6 at 2). *See* Dkt. No. 131 at 31. In his testimony, Defendant Holmes also refers to "*one* of the call-me-back-on-Monday emails," suggesting that he may have asked the same customer (in addition to others) to wait for his new employment at Defendant Ambyth to continue discussions. Dkt. No. 132-1 at 17 (104:10–11) (emphasis added). Finally, Plaintiff provides an email from Defendant Lyons to a customer on April 17, 2023, in which he writes, "I appreciate the email" (suggesting the customer had emailed him before then) as well as "[L]et me know if we need to get refreshed numbers for import," all of which could support a finding that an order was delayed. Viewing this evidence in the light most favorable to Plaintiff, it can be read to show that Defendants Holmes and Lyons delayed orders, causing Plaintiff to lose the revenue it would have earned from them.

As to Defendant Kinto, his own text message suggests that the Sales Defendants breached the confidentiality agreements they signed while still employed at Plaintiff. *See* Dkt. No. 130-7 at 2 (Defendant Kinto cautioning Defendants Holmes and Lyons that their sharing of "all this info . . . violates the agreements we signed"). However, the Court also finds that Plaintiff has produced no evidence that Defendant Kinto used confidential information while still employed there, delayed orders, or otherwise solicited customers before leaving for Defendant Ambyth.

Therefore, as to Plaintiff's claim for breach of duty of loyalty and confidentiality, Defendants' motion is DENIED IN PART as to Defendants Holmes and Lyons and GRANTED IN PART as to Defendant Kinto.

1

        **e.**     ***Tortious Interference with Contract***

2

        Finally, Plaintiff brings one claim for tortious interference against all Defendants and one

3

claim for tortious interference against only Defendants Morgan and Ambyth. Dkt. No. 84

4

¶¶ 178–83 (all Defendants), 184–89 (Morgan and Ambyth). As to the claim against all

5

Defendants, Defendants argue that it "suffers from the same deficit discussed at length above—

6

the complete absence of any evidence showing that any alleged unlawful use of [Plaintiff's]

7

confidential or trade secret information caused the reductions in business from the customers in

8

question." Dkt. No. 118 at 24; *see id.* at 23–24. As to the claim against Defendants Morgan and

9

Ambyth, Defendants argue similarly that there is no evidence that use of confidential and trade

10

secret information caused Plaintiff's alleged damages. *See* Dkt. No. 118 at 24. In response,

11

Plaintiff argues that Defendants Morgan and Ambyth committed tortious interference, evidenced

12

by Defendant Morgan's testimony that he hired the individual Defendants for their ability to

13

bring Plaintiff's customer list with them. *See* Dkt. No. 131 at 31–32.

14

        "Tortious interference has five elements: (1) business relationship/expectancy;

15

(2) defendant's knowledge of relationship; (3) intentional interference resulting in termination of

16

relationship; (4) improper purpose/means; and (5) damages." *Woods View II, LLC v. Kitsap*

17

*Cnty.*, 188 Wn. App. 1, 29–30, 352 P.3d 807 (2015) (citing *Pac. Nw. Shooting Park Ass'n v. City*

18

*of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006)); *accord United Fed'n of Churches, LLC v.*

19

*Johnson*, 598 F. Supp. 3d 1084, 1098 (W.D. Wash. 2022).

20

        Here, for the reasons discussed in the prior sections, the Court finds that Plaintiff has

21

produced sufficient evidence to create a genuine dispute of material fact that its reduced profits

22

resulted from Defendants' tortious interference. As to the claim against all Defendants, Plaintiff

23

has produced evidence that Defendants misappropriated trade secrets, which caused damage in

24

the form of lost profits from customers who ended business with Plaintiff and began business

1  with Defendant Ambyth. *See supra* § III.B.1.b. Further, as to the claim against Defendants

2  Morgan and Ambyth, Plaintiff has produced evidence that Defendant Morgan approached

3  Defendants Lyons, Kinto, and Holmes about their hire while they were still employed at Plaintiff

4  and ultimately hired them with the expectation that they would bring a portion of their business

5  with them. *See* Dkt. No. 130-3 at 5 (54:4–56:22), 6 (66:20–67:14).

6      Therefore, as to Plaintiff's claims of tortious interference, Defendants' motion is DENIED.

7      **2.     Attribution to Individual Defendants**

8      Finally, Defendants argue that Plaintiff "cannot prove the amount of damages caused by

9  any of the individual Defendants' alleged conduct." Dkt. No. 118 at 12. Defendants contend that

10  Plaintiff's alleged damages "are not a single, indivisible harm" but rather "rooted in alleged

11  reductions in business from discrete customers" such that "[e]ach individual Defendant . . . can

12  be liable only for the loss in business from the specific customers that he is alleged to have

13  interacted with improperly." *Id.* In response, Plaintiff points out that Defendants are joint

14  intentional tortfeasors, so it is not required to produce individual attribution of damages. *See* Dkt.

15  No. 131 at 28–29.

16      Here, the Court finds that Plaintiff is not required to calculate damages attributable to

17  each defendant. *See Brocade*, 873 F. Supp. 2d at 1218 ("Although the damages expert has not

18  apportioned damages to each individual defendant, this is not fatal to Plaintiffs' claims and does

19  not compel granting summary judgment in favor of Defendants."). After all, "[i]t does appear

20  that trade secret misappropriation is considered an intentional tort, and thus joint tortfeasors are

21  jointly and severally liable." *Id.* at 1217 (citing *Clark v. Bunker*, 453 F.2d 1006, 1011 (9th Cir.

22  1972)); *see also Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1164 (11th Cir. 2024)

23  (concluding that under Florida law, defendants may be jointly and severally liable for trade

24  secret misappropriation); 4 Milgrim on Trade Secrets § 15.02(3)(h) (2024) ("Joint and several

liability appears reasonable where the degree of wrong is the same among the several defendants."). To that end, Plaintiff has produced evidence that the Sales Defendants coordinated their departure from Plaintiff, met jointly with Defendant Morgan to discuss their potential employment, continued to discuss their departure after receiving a job offer from Defendant Ambyth, and ultimately started their new employment on the same day. *See* Dkt. Nos. 130-4, 130-5, 130-6, 130-7, 130-8; Dkt. No. 132-1 at 7 (33:19–35:1); Dkt. No. 132-2 at 6 (87:9–88:12). And separately, Defendant Ambyth will be vicariously liable for any misappropriation committed by the Sales Defendants as its employees should Plaintiff prove it UTSA claim. *See Thola v. Henschell*, 140 Wn. App. 70, 78, 164 P.3d 524 (2007) ("[O]ne may violate the UTSA vicariously and be held responsible for such violation.").

Therefore, as to joint liability, Defendants' motion is DENIED.

### III.   MOTION TO SEAL

**A.   Legal Standard**

There is a strong presumption of public access to court-filed documents. Local Civil Rule ("LCR") 5(g); *accord Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). A party seeking to seal records related to motions that are dispositive or otherwise "more than tangentially related to the merits of a case" must "meet the high threshold of showing that 'compelling reasons' support secrecy." *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1098–99 (9th Cir. 2016); *Kamakana*, 447 F.3d at 1180. However, if the motion is non-dispositive and only tangentially related to the merits of a case, a party need only make a showing of "good cause" under Federal Rule of Civil Procedure 26(c). *Ctr. for Auto Safety*, 809 F.3d at 1101.

**B.    Discussion**

Plaintiff moves to seal its opposition to Defendants' motion (Dkt. Nos. 131 (sealed), 129 (redacted)), as well as a supporting declaration and certain supporting exhibits (Dkt. Nos. 132 (sealed), 130 (redacted)). *See* Dkt. No. 128. Defendants join or do not oppose all of Plaintiff's requests while offering arguments specifically in support of sealing Exhibits 19 and 20. Dkt. No. 146.

The Court finds that Plaintiff has demonstrated compelling reasons to maintain the above materials under seal. All of Plaintiff's redactions or sealed documents contain either specific customer identities or confidential information, which this Court has already held to be material that may be kept under seal. *See* Dkt. No. 52 at 4–5. Moreover, Plaintiff's sealing requests are narrowly tailored, as the redactions are minimal and the few documents sealed in their entirety are comprised entirely of confidential customer lists and/or financial information.

Therefore, Plaintiff's motion is GRANTED.

## IV.    CONCLUSION

Accordingly, it is hereby ORDERED:

(1)    Defendants' Motion for Summary Judgment (Dkt. No. 118) is GRANTED IN PART and DENIED IN PART.

      (a)    Plaintiff's claim for CFAA restoration damages is DISMISSED.

      (b)    Plaintiff's claim for breach of the duty of loyalty and confidentiality against Defendant Kinto is DISMISSED.

      (c)    In all other respects, the motion is DENIED.

(2)    Plaintiff's Motion to Seal (Dkt. No. 128) is GRANTED.

(3)    The Parties SHALL meet and confer and file a joint status report **within thirty (30) days** of this Order. The Parties SHALL include the trial-ready date, the number of

days needed for trial, availability for trial through 2026, and the prospects for

settlement.

Dated this 3rd day of October 2024.

Tana Lin
United States District Judge