UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SILVER FERN CHEMICAL, INC., a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT LYONS, an individual; TROY KINTO, an individual; KING HOLMES, an individual; ROWLAND MORGAN, an individual; and AMBYTH CHEMICAL COMPANY, a Washington corporation,<br><br>Defendants. | CASE NO. 2:23-cv-00775-TL<br><br>ORDER ON RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW |
| SCOTT LYONS, an individual, TROY KINTO, an individual, and KING HOLMES, an individual,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>SILVER FERN CHEMICAL, INC., a Washington corporation, SAM KING, an individual, and LISA KING, an individual,<br><br>Counterclaim Defendants. | |

This matter is before the Court on a Renewed Motion for Judgment as a Matter of Law brought by Defendants Scott Lyons, Troy Kinto, King Holmes, Rowland Morgan, and Ambyth Chemical Company (collectively, "Defendants"). Dkt. No. 321. Having reviewed Defendants' motion, Plaintiff Silver Fern Chemical Incorporated's ("Plaintiff") response (Dkt. No. 343), Defendants' reply (Dkt. No. 352), and the relevant record, the Court DENIES Defendants' motion.

## I. Background

A jury trial was held on this matter beginning on December 1, 2025. Dkt. No. 275. Plaintiff presented its case to the jury and, when it rested, Defendants moved orally for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Dkt. No. 290. The Court granted Defendants' motion in part and dismissed Count 3, Breach of Duty of Loyalty and Confidentiality, against Defendants Lyons, Kinto, and Holmes. *Id*. Next, Defendants presented their defense and, on December 12, 2025, all Parties rested. Dkt. No. 294. On December 18, 2025, the jury reached a unanimous verdict, finding, in relevant part, that: (1) Plaintiff had established by a preponderance of the evidence that all Defendants misappropriated Plaintiff's trade secret under the Washington Uniform Trade Secrets Act ("WUTSA") and federal Defend Trade Secrets Act ("DTSA") (*see* Dkt. No. 316 (Redacted Jury Verdict) at 2–5); (2) Plaintiff had established by a preponderance of the evidence that Defendants Lyons, Kinto, and Holmes were liable for breach of contract against Plaintiff (*id*. at 7); (3) Plaintiff had not established by a preponderance of the evidence that Defendants committed tortious interference with business expectancy (*id*. at 9); and (4) Plaintiff had not established by a preponderance of the evidence that Defendants Morgan and Ambyth had committed tortious interference with business relationships and contracts (*id*. at 10). The jury awarded Plaintiff $1,916,137.00 in damages for the misappropriation-of-trade-secrets claims. *Id*. at 6. While the jury also found Defendants Lyons, Kinto, and Holmes had breached their respective confidentiality agreements, they awarded no additional damages for this violation. *Id*. at 8.

On January 22, 2026, Defendants moved for judgment as a matter of law under Rule 50(b). Dkt. No. 321. The instant matter is fully briefed and ripe for the Court's review.

//

//

## II. Legal Standard

### A. Federal Rule of Civil Procedure 50(b)

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)). The Rule 50 standard is "very high." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002). The jury's verdict "must be upheld if it is supported by substantial evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* In conducting its analysis, "the court should review all of the evidence in the record, . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150; *see also Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 802–03 (9th Cir. 2009) (noting that judgment as a matter of law "is appropriate when the jury could have relied only on speculation to reach its verdict"). A court may only grant judgment as a matter of law "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (citation omitted).

"Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *see also* Fed. R. Civ. P. 50(b). "Thus, a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule

50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *Id.* (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

**B. Federal Rule of Civil Procedure 59(a)**

Under Federal Rule of Civil Procedure 59(a)(1)(A), a court may, on motion, grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Rule 59 does not specify the grounds on which a motion for a new trial may be granted, and courts are "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). A "trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Id.* (citation omitted). "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'" *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)).

## III. DISCUSSION

**A. The Defend Trade Secrets Act and Washington Uniform Trade Secrets Act**

Claims for misappropriation of trade secrets under the DTSA and the WUTSA are "substantially similar." *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1336 (W.D. Wash. 2021). Under the DTSA, "the definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th

Cir. 2020) (citing 18 U.S.C. § 1839(3), (5)). The WUTSA defines a trade secret as

> information . . . that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its own disclosure or use and is a subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Promedev, LLC v. Wilson*, No. C22-1063, 2023 WL 2330377, at *4 (W.D. Wash. Mar. 2, 2023) (quoting RCW 19.108.010(4)(a)–(b)) (citation modified). In a trade-secret claim, a plaintiff must prove: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC*, 978 F.3d at 657–58 (citing 18 U.S.C. § 1839(5)); *see also Traverse Therapy Servs., PLLC v. Sadler-Bridges Wellness Grp., PLLC*, No. C23-1239, 2024 WL 381180, at *3 (W.D. Wash. Feb. 1, 2024) (finding that the elements of the DTSA and WUTSA are "substantially similar"). "[A] plaintiff seeking relief for trade secret misappropriation must identify the trade secret 'with sufficient particularity to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1178 (W.D. Wash. 2019) (quoting *SMS Signature Cars v. Connects Mktg. LLC*, No. C12-1300, 2012 WL 12893935, at *2 (C.D. Cal. Oct. 29, 2012)) (citation modified).

**1. Plaintiff Possessed a Trade Secret**

**a. *Information***

Defendants argue that Plaintiff did not "clearly refer to tangible trade secret material instead of referring to a system which potentially qualifies for trade secret protection" and needed to refer to tangible trade secret material, not reference a large swath of documents. Dkt. No. 321 at 16–17 (quoting *InteliClear, LLC*, 978 F.3d at 658). Defendants assert that because Plaintiff "did not specify any particular list or claimed trade secret compilation," Plaintiff's

reference to the client list is inadequate to prove a trade secret. *Id*. at 16 (citing *IneliClear, LLC*, 978 F.3d at 658). But in the context of explaining what a plaintiff needs to provide in describing a trade secret, the court in *IneliClear, LLC*, also held that "[t]he plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade.'" *Id*. (quoting *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998)). Further, Plaintiff was not required to point to one singular list or document, because "[t]he Washington Uniform Trade Secrets Act defines a 'trade secret' to include compilations of information which have characteristics *without regard to the form* such information might take," and "do[es] not imply the requirement of written documents." *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 445, 971 P.2d 936 (1999) (emphasis added).

Throughout this case and at trial, Plaintiff asserted it had one trade secret—its confidential compilation of customer information. Dkt. No. 343 at 8. This compilation of information "consisted of customer names, customer contact information, customer product requirements, and vendors who meet customer product requirements." *Id*. At trial, Sam King, Plaintiff's co-founder and co-owner, testified in detail about this compilation of information that was contained within Plaintiff's private and password protected Chempax and eChempax systems (Dkt. No. 344-5 (S. King Trial Transcript Dec. 8, 2025) at 14–15 (50:10–51:16)) and consisted of inventory deal sheets (*id*. at 15 (51:17–23)), transaction deal sheets (*id*. at 15–17 (51:24–53:3)), customer folders (*id*. at 17 (53:4–10)), and vendor folders (*id*. at 15 (53:11–15)). For example, Sam King testified that eChempax contained confidential information, such as sales history, orders, pricing, and costs. *Id*. at 15 (51:12–16)). More specifically, Sam King testified that the transaction deal sheets are "basically a budget of what the order looked like," and that "it would have what the product is, the grade, the quantity, where it needed to be delivered to," and "where we bought [the product] from," and "who the supplier is, and what the

cost was." *Id*. at 16 (52:1–12). And if "product was one of the inventory products," the deal sheet would tell the reader "what warehouse would it come out of, and what [was] our current inventory cost on that[.]" *Id.* (52:13–16).

The facts here are similar to those in *Earthbound Corp. v. MiTek USA Inc.*, No. C16-7223, 2017 WL 2919101 (C.D. Cal 2017), where the court found that a compilation of information located in a secure drive constituted a trade secret under the WUTSA. *Id*. at *12. The compilation in *Earthbound Corp.* consisted of "customer names, contact information, price lists, and their requirements and preferences; negotiated supplier and vendor costs; . . . job files; prior, current, and pending bids, estimates, and project lists; technical project data; [and] revenue, costs, and profit margins . . . ." *Id*. at *2. Similar to Plaintiff's security measures regarding the compilation at issue here (*see* Dkt. No. 344-5 at 17–18 (53:16–54:13)), the plaintiff in *Earthbound* required user credentials and a password to access such information. *See Earthbound Corp.*, 2017 WL 2919101, at *2.

Sam King did not just say that trade secrets existed in certain internal systems and stop there. Instead, he identified where the trade secret was located in Plaintiff's system—such as Chempax, and eChempax, as well as what the trade secrets were—deal sheets, customers folders, and vendor folders, and identified aspects of these systems with enough specificity for the jury to conclude Plaintiff identified its customer compilation as a trade secret.

Therefore, looking at the evidence in light most favorable to Plaintiff, the jury's finding that Plaintiff proved the "information" prong of the trade-secret definition is supported by substantial evidence.

**b. *Valuable Because It Was Unknown to Others***

Defendants argue that Plaintiff did not prove that the information in Plaintiff's compilation was valuable, because most of the customers' identities were known to competitors.

*See* Dkt. No. 321 at 18. But this argument completely misses the mark. Plaintiff argued that it was the *compilation* of customer information—which included "customer names, customer contact information, customer product requirements, and vendors who meet customer product requirements"—that formed the trade secret, not the just *identities* of the customers. Dkt. No. 343 at 8.

It has long been recognized that "[c]ustomer identities and related customer information can be a company's most valuable asset and may represent a considerable investment of resources." *Nowogroski Ins., Inc.*, 137 Wn. 2d at 443 (quoting Restatement (Third) of Unfair Competition § 42 cmt. f (1995)). Further, "[a] trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere," because "[s]uch a burden would be insurmountable since trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets." *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 50, 738 P.2d 665 (1987); *see also Earthbound Corp.*, 2017 WL 2919101, at *12 (finding that although some of the information in plaintiff's trade secret, such as customer names and contact information, was public, that did not negate the compilation's trade-secret status) (citing *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016), *overruled on other grounds by United States v. Sullivan,* 159 F.4th 579 (9th Cir. 2025)).

The most important consideration in identifying a trade secret is "whether the information is readily accessible to a reasonable diligent competitor[.]" *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1332 (9th Cir. 1980). Where customer lists are involved, "[e]vidence concerning whether a reasonably diligent salesman could perceive a narrowing classification which reduces substantially the costs of identifying potential customers is thus relevant to determining accessibility." *Id.* And where a compilation of information cannot be easily recreated by a competitor's mere talking with customers, then the information necessarily

cannot be readily accessible to a competitor and, therefore, qualifies as a trade secret. *See Multifab, Inc. v. Zweiger*, No. C19-6164, 2020 WL 2614736, at *4 (W.D. Wash. May 22, 2020) (citation omitted).

In reference to the confidential information on eChempax, which contained customer information such as sales history, orders, pricing, and costs (Dkt. No. 344-5 at 15 (51:12–16)), Sam King asserted that it was valuable because it was essentially the "keys to the castle" and the "shortcut" to how to successfully do business with Plaintiff's customers (*see id*. at 19 (55:16–23)). The evidence at trial showed that it is not just a matter of knowing the identity of the customer company, but actually knowing whom to contact at the company, and how to reach them, so that their delivery needs may be fulfilled—information that Sam King testified Plaintiff has. *Id*. at 11 (30:14–24). Further, Sam King testified that the right person to contact at a company can vary by company, that knowing who the decision maker is at that company is crucial, and that simply calling an 800 number is "not going to get you very far, easily." *Id*. at 11–12 (30:14–31:24). Sam King testified that only 2 to 5% of Plaintiff's customer leads actually resulted in a customer relationship. *Id*. at 4 (19:5–9). Sam King also testified that it would take someone without access to Plaintiff's confidential compilation of customer information "years and years" to create the compilation from scratch. *Id*. at 19–20 (55:24–56:1–7). He testified that this compilation of customer leads is valuable because it is a shortcut to customers, and that if another company had it, they could go to the same supplier and offer the product to the customer at a different margin. *Id*. Plaintiff also had specifics on what type of product those companies would want, such as the grade they need, what quantity they need, and where and how they want products delivered. *See id*. at 16 (52:1–12); *id*. at 4–5 (19:22–20:10). Plaintiff established at trial that the deal sheets are important because they have "all of the information about the transaction," which shows "how [Plaintiff] make[s] the profit." *Id*. at 16 (52:19–20).

Defendants' own testimony at trial confirmed that the information in Plaintiff's compilation was valuable. For example, Defendant Kinto conceded that the information in deal sheets are not accessible to the general public and, therefore, is not something he would want to broadcast to competitors. Dkt. No. 344-3 at 11–12 (108:17–109: 11). The evidence also showed that on April 16, 2023, when Defendant Holmes already knew he was leaving for Defendant Ambyth, Defendant Holmes accessed a customer pricing folder on Plaintiff's internal system to look at past business he had done with a customer. Dkt. No. 344-1 (K. Holmes Trial Testimony Dec. 2, 2025) at 17–19 (51:5–8; 52:7–17; 53:10–18). This was a file that ultimately ended up on Defendant Holmes' personal computer. *Id*. at 19 (53:13–15). The evidence also showed that after Defendants Holmes, Lyons, and Kinto arrived at Defendant Ambyth, Defendant Ambyth for the first time did business with several of Plaintiff's former customers. Dkt. No. 344-6 (R. Morgan Trial Testimony Dec. 10, 2025) at 3 (19:8–24). This evidence leads the Court to ask, if all of this customer information was general knowledge in the industry, or could easily be recreated by merely talking to customers, then why would Defendant Holmes need to review it before leaving Plaintiff, and why would it end up on his personal computer?

Next, Defendants argue that to qualify as a trade secret, Plaintiff's compilation must be shown to have novelty and uniqueness, and that Plaintiff did not prove either at trial. Dkt. No. 321 at 19 (citing *Seaside Inland Transp. v. Coastal Carriers LLC*, No. C17-143, 2019 WL 4918747, at *9 (W.D. Wash. Oct. 4, 2019)). "Although the definition of trade secret is broad, it is not limitless, and the proponent must plausibly allege that the information possesses some novelty in order to warrant trade secret protection." *Promedev*, 2023 WL 2330377, at *4 (citation modified). Information is considered "novel" if it is not "readily ascertainable from another source." *Id*. (citing *Belo Mgmt. Servs., Inc. v. ClickA Network*, 184 Wn. App. 649, 657, 343 P.3d 370 (2014).

Defendants argue that Plaintiff did not show novelty or uniqueness because "[Plaintiff] did not demonstrate that its customers were unique. There was no showing of exclusive contracts, specialized products, or unknown vendors," and "there was extensive evidence that Silver Fern's customers were known to competitors and its vendors were known in the industry." Dkt. No. 321 at 20. Defendants assert that "[Plaintiff's] customers were a measure of its success, but knowledge of them or vendors was not unique in the industry and could not be a trade secret." *Id.* at 21. These arguments again focus solely on the *identities* of customers and those identities being public knowledge, rather than the entirety of Plaintiff's customer compilation, and the Court again rejects the argument for the reasons it stated above. Although the identities of customers in the industry is public information, when a compilation includes multiple layers of specifics that have historically led to business with customers and would, in the words of Sam King, take "years and years" to put together, that is a list that is not readily available to others, meaning it is novel.

In sum, although the identity of some of Plaintiff's customers may have been public, looking at the evidence in light most favorable to Plaintiff, the jury's finding that Plaintiff proved its compilation of customer information was unique as well as valuable because it was unknown to others (and, therefore, a trade secret) is supported by substantial evidence.

**c. *Attempts to Keep Information Secret***

At trial, Sam King testified that Plaintiff's trade secret was stored in Plaintiff's two-factor-authentication, password-protected private servers. Dkt. No. 344-5 at 17–18 (53:16–54:13). As another layer of security, salespersons working for Plaintiff could only access a deal sheet for the deal on which they worked, and their peers could not access each other's eChempax information. *Id.* at 18–19 (54:20–55:15). Plaintiff did this to keep the salesperson's deal sheet "separate" from and "confidential" to other salespersons. *Id.* The evidence at trial also

established that Plaintiff required Defendant Holmes, Defendant Lyons, and Defendant Kinto to sign confidentiality agreements. *See* Dkt. Nos. 277 (Joint Exhibit 03 (Holmes Agreement)), 278 (Joint Exhibit 02 (Kinto Agreement)), 280 (Joint Exhibit 04 (Lyons Agreement)). In Defendant Holmes's agreement, for example, confidential material meant "[s]ales plans, business plans, sales forecasts, product lists, pricing information, the identity of [Plaintiff's] customers, the identity of suppliers, and company financial information." Dkt. No. 344-1 (K. Holmes Trial Transcript Dec. 2, 2025) at 5 (12:9–19).

In their motion, Defendants do not dispute that Plaintiff password-protected servers, put barriers between individual salespersons' deal sheets, and required Defendant Holmes, Defendant Lyons, and Defendant Kinto to sign confidentiality agreements. Instead, Defendants focus on arguments such as, the competitors knew the identities of Plaintiff's customers (Dkt. No. 321 at 18), and that the chemical-distribution business is not a secret industry (*id*. at 20). And Defendants did not offer any evidence at trial that rebutted Plaintiff's evidence of efforts to keep its customer compilation secret.

Therefore, viewing the evidence in the light most favorable to Plaintiff, the jury's finding that Plaintiff made attempts to keep its customer compilation secret is supported by substantial evidence.

**2. Defendants Misappropriated Plaintiff's Trade Secret**[1]

Under the DTSA, misappropriation of a trade secret means "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret

[1] Plaintiff argues that in their Rule 50(a) oral motion, Defendants never made an argument related to misappropriation of trade secrets. The Court finds that this argument was raised (*see* Dkt. No. 344-7 at 24–25). *See Go Daddy Software*, 581 F.3d at 961 ("Rule 50(b) 'may be satisfied by an ambiguous or inartfully made motion' under Rule 50(a)." (quoting *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989))).

was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . . .” *Tori Belle Cosmetics, LLC v. Meek*, No. C21-66, 2023 WL 3043865, at *7 (W.D. Wash. Apr. 21, 2023) (quoting 18 U.S.C. § 1839(5)). The WUTSA defines misappropriation of a trade secret as “disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.” *A Place for Mom v. Perkins*, 475 F. Supp. 3d 1217, 1225 (W.D. Wash. 2020) (quoting RCW 19.108.010(2)(b)(ii)(B)). Misappropriation of a trade secret may be proven “by circumstantial as well as direct evidence.” *UniRAM Tech., Inc., v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) (citing *Droeger v. Welsh Sporting Goods Corp.,* 541 F.2d 790, 792 (9th Cir. 1976)).

Defendants argue, in part, that Plaintiff could not prove misappropriation, because “many [Plaintiff] customer identities were not confidential.” Dkt. No. 321 at 24. Defendants go on to argue that Plaintiff relied on 18 transactions to prove misappropriation. *Id*. at 24. Among these 18 transactions, Defendants argue that: there is no evidence Defendants did business with two of them; one of the customers was a legacy customer of Defendant Kinto’s; and that for ten of the customers, trial testimony “demonstrated isolated contact,” and Plaintiff “never proved that the customers in question were among the group of customers who were confidential[.]” *Id*. at 24–25. As to Defendant Morgan, Defendants argue that “there was no evidence that he knew or used [Plaintiff]’s claimed trade secrets in any way.” *Id*. at 24. But there are several evidentiary reasons why Defendants’ arguments do not meet the burden of proving that the only reasonable conclusion weighs in their favor.

As a preliminary matter, the Court will not repeat and incorporates in this section its discussions in Sections III.A.1.b. and III.C. The evidence showed that Defendants Holmes, Kinto, and Lyons all signed confidentiality agreements to work for Plaintiff. Dkt. Nos. 277 (Joint Exhibit 03), 278 (Joint Exhibit 02), 280 (Joint Exhibit 04). Shortly after Defendants Lyons, Kinto, and Holmes joined Defendant Ambyth, Defendant Ambyth began working with customers with whom they had never done business before—customers who had previously worked with Plaintiff. For example, Defendant Lyons admitted that when he began working at Defendant Ambyth, he reached out to a customer with whom he had worked during his time working for Plaintiff. Dkt. Nos. 344-2 at 8–9 (121:12–122:16). Defendant Lyons also emailed a customer of Plaintiff's a couple days after he began working for Defendant Ambyth. *See id*. at 7 (100:7–13). As for Defendant Holmes, he admitted to calling a number of Plaintiff's customers to solicit their business shortly after he moved to Defendant Ambyth, even calling one customer his very first day at Defendant Ambyth. *See* Dkt. No. 344-1 at 3–4 (8:21–9:1); *see also id*. at 26 (80:2–81:21); 20–23 (63:16–64:20, 68:22–69:1). Even taking away the one customer that Defendants argue was a legacy customer of Defendant Kinto's, and the two customers about whom they argue there was no evidence that Defendant Ambyth ever did business with, that leaves 15 transactions that Defendants concede were admitted into evidence, and for which they also concede there was contact with those customers. And conduct such as Defendant Holmes's accessing and downloading of customer pricing folders has been found sufficient to demonstrate misappropriation of trade secrets. *See Guidance Residential, LLC v. Mangrio*, No. 75507-2-I, 2017 WL 6452421, at *8 (Wash. Ct. App. Dec. 18, 2017).

As to Defendant Morgan, the evidence showed that he knew that Defendants Lyons, Kinto, and Holmes were bound by confidentiality agreements. Dkt. No. 344-6 at 12–13 (54:2–55:12). Defendants rely heavily on the fact that "[u]ndisputed testimony showed that Mr.

Morgan did not request or receive confidential information from departing Defendants and required their written agreement to refrain from using Plaintiff's confidential information." Dkt. No. 352 at 13. But the jury's verdict regarding Defendant Morgan individually reflects that even if Defendant Morgan's testimony on this issue was undisputed, the jurors did not accept this testimony as credible as they found that not only that was he individually liable for misappropriating the trade secrets (*see* Dkt. No. 316 at 2) but also that he did so willfully and maliciously (*id.* at 3). The Court cannot disturb that credibility finding. *Reeves*, 530 U.S. at 150.

Plaintiff made clear at trial that its trade secret was its customer compilation—meaning all of the confidential information it described, relating to all customers in the compilation, and that the jury heard that the customers involved in the transactions presented at trial were a part of the compilation. Given the fact that misappropriation can be proven through circumstantial and direct evidence, the Court finds that the evidence presented at trial does not lead to only one reasonable conclusion in favor of Defendants.

Therefore, the jury's finding that Defendants misappropriated trade secrets is supported by substantial evidence.

**3. Defendants' Misappropriation of the Trade Secret Caused Plaintiff Damage**

"A plaintiff may recover lost profits if the evidence establishes the damages with reasonable certainty." *Guidance Residential, LLC*, 2017 WL 6452421, at *5 (citing *Eagle Grp., Inc. v. Pullen*, 114 Wn. App. 409, 418–19, 58 P.3d 292 (2002). "The reliability of such evidence is for the trier of fact to determine." *Id.* "A plaintiff ordinarily proves lost profits based on its profit history." *Eagle Grp., Inc.*, 114 Wn. App. at 418. However, as it is sometimes difficult to find "[a] measuring stick, whereby damages may be assessed within the demarcation of reasonable certainty," a plaintiff "must produce the best evidence available and '. . . if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial

recovery because the amount of the damage is incapable of exact ascertainment . . . .'" *Lundgren v. Whitney's, Inc.*, 94 Wn. 2d 91, 98, 614 P.2d 1272, (1980) (citation omitted). "If a plaintiff has produced the best evidence available, and if the evidence affords a reasonable basis for estimating the loss, courts will not permit a wrongdoer to benefit from the difficulty of determining the dollar amount of loss." *Id.* "'[W]here the fact is well established that profits would have been made and the difficulty in proving their amount is directly caused by the defendant's breach, a greater liberality is permitted in making estimates and drawing inferences.'" *Nw. Prod. Design Grp., LLC v. Homax Prods., Inc.*, No. 67278-9-I, 2013 WL 992666, at *10 (Wash. Ct. App. Mar. 11, 2013) (quoting *No Ka Oi Corp. v. Nat'l 60 Minute Tune, Inc.,* 71 Wn. App. 844, 851, 863 P.2d 79 (1993)). The Washington Court of Appeals has found that expert testimony alone is sufficient to award lost profits. *Eagle Grp., Inc.*, 114 Wn. App. at 419 (citing *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 17, 390 P.2d 677 (1964)).

Defendants argue that Plaintiff claimed damages without proof of customer decision making, and that Plaintiff focused on "Defendants' transactions without proof of [Plaintiff]'s willingness or ability to engage in such transactions or the terms which [Plaintiff] would have offered. . . ." Dkt. No. 321 at 25. Essentially, Defendants argue that Plaintiff seeks damages based on speculation, because Plaintiff "asked the jury to infer that it would have completed all of [Defendant] Ambyth's transactions on its profit margins had Defendants not used Silver Fern's trade secrets." *Id*. at 26.

At trial, Plaintiff called Neal Beaton as a witness. Mr. Beaton testified about Plaintiff's past lost profits, the profits that Plaintiff had already lost as of the time Mr. Beaton issued his report, and Plaintiff's expected future lost profits. *See* Dkt. No. 344-7 (N. Beaton Trial Testimony Dec 11, 2025) at 3–5 (8:19–10:8)). Mr. Beaton's evidentiary testimony showed that he calculated past and future lost profits by looking at what Plaintiff was doing prior to

Defendants Lyons, Kinto and Holmes's departures, compared to what Plaintiff was doing after that time, and that he measured the difference between what Defendant Ambyth had been generating in sales after Defendants Lyon, Kinto and Holmes joined it. *See id.* at 4–5. In other words, Mr. Beaton "figured out the revenue associated with the customers at issue, applied [Plaintiff]'s profit margin to determine how much money [Plaintiff] would have made if those customers had stayed at [Plaintiff], and used that methodology to calculate both past and future lost profits." Dkt. No. 343 at 23 (citing Dkt. No. 344-7 at 6–13 (14:10–21:23)). Mr. Beaton's methodology only included calculating the past and future loss Plaintiff incurred as a result of Plaintiff's former customers instead working with Defendant Ambyth after the arrival of Defendants Lyons, Holmes, and Kinto. Dkt. No. 344-7 at 3–4 (8:19–9:5). "The jury is free to accept or reject the evidence provided, so long as the verdict is within the range of the evidence." *Guidance Residential, LLC*, 2017 WL 6452421, at *9 (citing *Ed Nowogroski Ins., Inc. v. Rucker*, 88 Wn. App. 350, 359, 944 P.2d 1093, 1097 (1997), *aff'd*, 137 Wn. 2d 427, 971 P.2d 936 (1999)). And here, the jury did so by listening to Mr. Beaton's testimony and deciding that Defendants caused damages that resulted in a $1,916,137.00 award. It was logical for the jury to make the connection between Defendant Ambyth's revenue increasing as a result of new customers who had formerly dealt with Plaintiff and had not previously been customers of Defendant Ambyth, and Plaintiff's losing out on revenue from those customers. The jury reasonably considered that this was damage to Plaintiff that had been caused by Defendants. Further, viewing the evidence in light most favorable to Plaintiff, this body of evidence cannot reasonably lead the Court to finding that the only reasonable conclusion is that Plaintiff did not prove damages.

Therefore, the jury's finding that Defendants caused Plaintiff damage by misappropriating trade secrets is supported by substantial evidence.

**B. Breach of Contract by Defendants Lyons, Kinto, and Holmes**

To prove breach of contract, a plaintiff must show: (1) a valid contract, (2) a breach of duty arising under that contract, and (3) the resulting damage. *Lakeview Loan Serv., LLC v. Snyder*, No. C25-5344, 2026 WL 113614, at *3 (W.D. Wash. Jan. 15, 2026) (citing *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995)). Here, Defendants argue that the confidentiality agreements for Defendants Lyons and Holmes did not cover information that is known to the public or competitors, and that Defendant Kinto's agreement carved out an exception for legacy customers. Therefore, "Plaintiff's concessions that its customers were known to competitors are fatal to its contract claims[.]" Dkt. No. 321 at 27. Additionally, Defendants argue that "Plaintiff's breach of contract claim also fails because it did not prove damages due to the individual Defendant's [*sic*] alleged actions." *Id*. Defendants assert that individual damages were not proven because Plaintiff's expert, Mr. Beaton, "specifically disclaimed any such calculation based on individual Defendants' actions or transactions." *Id.*

Again, Defendants rely, in part, on the theory that the fact that identities of some of the customers were public means there was no breach by Defendants. But, as discussed above, Plaintiff showed that its customer compilation included much more than just the identities of the customers. Further, Plaintiff showed through direct and circumstantial evidence that Defendants used such information at Defendant Ambyth. *See supra* Section III.A.2. Therefore, despite the jury's having heard that the confidentiality agreements of Defendants Holmes and Lyons did not cover information known to the public, the jury also heard that the compilation included substantial information that was not public and was part of Plaintiff's trade secret. *See supra* Section III.A.1.b.

As to Defendant Kinto's testimony about legacy customers, the jury also heard competing testimony from Sam King that some of the customers Defendant Kinto claimed were

legacy customers with whom he had worked with before his employment with Plaintiff, and whom he had taken with him to Defendant Ambyth, were not actually customers with whom he had done business prior to working for Plaintiff. Dkt. No. 344-5 at 25–27 (131:24–133:19). Meaning, the jury heard evidence that some of the customers Defendant Kinto claimed to work with at Defendant Ambyth were not customers he had had prior to working for Plaintiff. The jury is the judge of a witness's credibility, and the jurors decided that they believed Sam King's testimony.

Further, Defendants point to no evidence from the trial that demonstrates that they attempted to continue customer relationships without the information from Plaintiff's customer compilation. In other words, Defendants do not identify any evidence from trial that tends to indicate that they did not breach their confidentiality agreements through the relationships with Plaintiff's former customers. Finally, the jury heard evidence from Mr. Beaton about Plaintiff's lost profits from customers who did business with Defendant Ambyth instead of Plaintiff. Dkt. No. 344-7 at 3–5 (8:19–10:8). Mr. Beaton's testimony was evidence of damages that resulted from Defendants Lyons, Kinto, and Holmes's working with customers who formerly did business with Plaintiff. *See also supra* Section III.A.3. Although the jury did not award additional monetary damages for the breach of the confidentiality agreements, they still found that damages resulted from this breach. There was also evidence that Defendants Holmes, Lyons, and Kinto worked together to plan their departure from Plaintiff, take Plaintiff's confidential information, and use it at Defendant Ambyth. *See* Dkt. No. 344-6 at 11 (52:3–25); *see also infra* Section III.C. But in the end, while the jury found Plaintiff had been injured by the three Defendants, it also found that there was no additional damage beyond what it had awarded for the trade-secret violations. The jury awarded no additional money to Plaintiff for the breach of confidentiality claims. Dkt. No. 316 at 8. Given the evidence as a whole, it cannot be said that

the only possible conclusion that can be reached is that Plaintiff was not damaged by Defendants Lyons, Kinto, and Holmes's breaching of their confidentiality agreements.

Therefore, the jury's finding that Defendants committed breach of contract is supported by substantial evidence.

**C. Willful and Malicious**

To begin, Plaintiff argues that Defendants did not raise arguments in their oral Rule 50(a) motion related to whether Defendants' actions were willful and malicious. Dkt. No. 343 at 25. The transcript of Defendants' Counsel's arguments supports Plaintiff's assertion. *See* Dkt. No. 344-7 at 14–32 (123:11–141:17). Further, Defendants do not dispute that they did not make arguments regarding willful and malicious in their Rule 50(a) oral motion. *See* Dkt. No. 352 at 14–15. If the grounds for a 50(b) motion were not previously asserted in a Rule 50(a) motion, the court should reverse a jury's verdict only if there is plain error. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001). "This exception, however, permits only extraordinary deferential review that is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency." *Id*.

Neither the DTSA or WUTSA defines willful or malicious. *See* 18 U.S.C. § 1836; RCW 19.108.010. Because the statutes do not define willful or malicious, the Washington Court of Appeals has, in the context of trade secrets, used dictionary definitions to define the terms. *See, e.g.*, *Kassa Ins. Servs., Inc. v. Pugh*, Nos. 31196-1-III & 31300-0-III, 2014 WL 1746059, at *5 (Wash. Ct. App. Apr. 29, 2014). "'Willful' is synonymous with 'voluntary' and 'intentional.'" *Id*. (citing Black's Law Dictionary at 977, 1640 (8th ed. 2004)). The Court's final jury instructions defined maliciousness as "being characterized by, or as a result of, ill will or improper motive." Dkt. No. 307 at 30.

In sum, Defendants argue that they "did nothing more than compete for business from the customers they dealt with in the past." Dkt. No. 321 at 28. But "even in the absence of an enforceable covenant not to compete, [a former employee] remains under a duty not to use or disclose, to the detriment of the former employer, trade secrets acquired in the course of previous employment." *Nowogroski Ins., Inc.*, 137 Wn.2d at 437. Defendants also assert that they "used information generally available to competitors[.]" Dkt. No. 321 at 28. But the evidence told a different story. The jury heard evidence that: Defendant Kinto at one point believed that he and Defendants Lyons and Holmes were violating their confidentiality agreements (*see* Dkt. No. 344-3 at 4 (83:15–19); Defendant Kinto said he did not want to get caught in a "tangled web of lies"[2] in a texting thread with Defendants Holmes and Lyons, where the three were discussing their confidentiality agreements with Plaintiff (*id.* at 3 (81:1–83:14); in the same text thread while discussing departure dates, Defendant Holmes said, "FYI, there is a chance our phones could get subpoena'd if this gets ugly" (Plaintiff Exhibit 70); Defendant Kinto received advice that using Plaintiff's confidential information might be a breach of his confidentiality agreement but proceeded anyway (*see id*. at 5 (86:5–12), 6 (87:9–16)); Defendants Lyons, Kinto, and Holmes planned their departure months in advance, but only notified Sam and Lisa King the morning of their departure (*id*. at 7–9 (88:5–90:10); Dkt. No. 344-6 (52:11-20)); Defendants Lyons, Kinto, and Holmes deleted emails they sent and received, thus ridding a paper trail of what was happening (Dkt. No. 344-4 (L. King Trial Testimony Dec. 5, 2025) at 4–6 (8:21–10:17); Plaintiff was a small company where Defendants Lyons, Kinto, and Holmes made up half of the sales team, were the most senior salespersons, and losing them so abruptly was a big deal (*id*. at 4–5 (8:21–9:11); and the hasty exit of Defendants Lyons, Kinto, and Holmes left Sam and Lisa King

[2] Defendants assert that this particular text was about golf. Dkt. No. 352 at 14. But again, the jury's verdict reflects they did not find this assertion credible.

with monumental damage control to deal with (*id*. at 3–7 (7:19–11:4). Defendants presented explanations for much of this evidence, but the jury's verdict reflects that it rejected those explanations. The jury found that Defendants acted willfully and maliciously. Dkt. No. 316 at 3. Viewing the evidence in light most favorable to Plaintiff, the Court does not find that the only reasonable conclusion is contrary to the jury's finding. Under the plain-error standard, the Court finds there was evidence to support the jury's verdict. Even if the Court applies the typical standard of sufficiency, it finds the evidence the jury relied on was sufficient.

Therefore, the jury's finding that Defendants acted willfully and maliciously is not plain error, and is also supported by substantial evidence.

**D. Defendants' Request for a New Trial**

Defendants move for a new trial as an alternative to their motion for judgment as a matter of law. Dkt. No. 321 at 29. Defendants do not make any new arguments for why they should be granted a new trial and, instead, incorporate the arguments they made in support of their motion for judgment as a matter of law. *See id*. A "trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski*, 481 F.3d at 729 (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). Incorporating the rationale the Court provided throughout this Order on Defendants' motion for judgment as a matter of law, the jury's verdict is not contrary to the clear weight of the evidence. Therefore, the Court DENIES Defendants' motion for a new trial.

//

//

//

//

## IV. CONCLUSION

Accordingly, Defendants' Renewed Motion for Judgment as a Matter of Law is DENIED. Defendants' alternative motion for a new trial is also DENIED.

Dated this 25th day of August, 2026.

Tana Lin
United States District Judge